# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SUSAN J. MOENNICH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 02 C 9256 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| METROPOLITAN PIER and ) | |
| EXPOSITION AUTHORITY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Susan Moennich ("Moennich") sued her former employer, the Metropolitan Pier and Exposition Authority ("MPEA"), alleging that MPEA discriminated against her based on her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) (2006). MPEA has moved for summary judgment. For the reasons explained below, MPEA's motion for summary judgment is granted in part and denied in part.

### I. BACKGROUND

Moennich was employed by MPEA from 1986 through 2001. She started in the Security and Safety Department, became an Assistant Construction Manager, and eventually became a Development Manager. In 1997, Moennich was promoted to Assistant Director of FOCUS One, a new department within the MPEA that handled electrical and plumbing issues as well as customer service. Overall, FOCUS One provided utility services such as plumbing, communications and electrical services for exhibitors at the Navy Pier and McCormick Place.

1

As Assistant Director, Moennich was responsible for training in the department and for order processing and placement. Her supervisor was Henry Walder ("Walder"), who was the Senior Director of Development/FOCUS One.

Through her employment with the MPEA, Moennich became acquainted with Freeman Companies ("Freeman"), a company that sets up trade shows and conventions in major convention centers throughout the United States and Canada. In the summer of 2001, Moennich told Joyce Rosinski, the Vice President and General Manager of Freeman, that her retirement benefits were vested with MPEA and that she was interested in a position at Freeman. Freeman created a new position for her, which would consist of conducting research, overseeing projects, and working with customers. On August 31, 2001, Freeman memorialized its offer of employment in writing and Moennich accepted.

On September 1, 2001, Moennich submitted a letter of resignation to MPEA, indicating that she was taking a position with another company and that her last day in the office would be September 14, 2001. She indicated she would be on vacation the weeks of September 17 and September 24 and that she would start her new job on October 1, 2001.

On September 6, 2001, MPEA Chief Executive Fawell announced that Walder would transition from Senior Director of Development/FOCUS One to oversee the McCormick Place expansion and that David Causton ("Causton") would work with FOCUS One during the transition period. Causton oversaw the day to day operations of FOCUS One from September 6, 2001 until November 30, 2001.

After the terrorist attacks on September 11, 2001, Freeman experienced a loss of business. Robert Lozier, the executive vice president of Freeman, called Moennich and

informed her that he anticipated layoffs within the company and that he did not think he could guarantee her job beyond December.  However, Freeman did not withdraw its offer of employment to Moennich at the time.

Moennich spoke to Walder about returning to MPEA.  There is significant dispute about the conditions of her return.  MPEA asserts Moennich was allowed to return for two months.  Walder testified that he spoke to Causton about allowing Moennich to return on a temporary basis to assist with the E-Commerce project, which she had been working on prior to her resignation.  Causton agreed to allow her to work on the E-Commerce project for two months.  However, Moennich contends she was being allowed to return permanently; she avers that Walder told her to "say she is back for a while and working on special projects. . . . Then after she is back noone [sic] would notice and she should just stay."  Pl.'s Statement of Facts 8.  It is undisputed that on October 1, 2001, Causton and Gloria Jackson, the Customer Service manager, met with Moennich.  Causton averred that he and Jackson explained to her that her assignment was to work on the E-Commerce project, which would last for approximately two months.  Def.'s Statement of Facts 56.  Moennich admits that the meeting occurred but denies that Causton and Jackson told her the project would last only two months.

On October 3, 2001, Moennich wrote Tanya Navratil, the Assistant Director of Human Resources at MPEA, a letter stating that she was rescinding her resignation and that there should be no lapse in employment or benefits.  There is no evidence that Navratil responded to Moennich's letter at the time.

That same day, Yolanda Green wrote Causton an e-mail requesting clarification regarding Moennich's position, stating, "I was under the impression that she was here to work on special projects." Def.'s Ex. 22. On October 9, Causton responded:

> [L]et me be clear. Susan [sic] role is to only be involved in handling the e-commerce site project. She will be here for two months and then go to work for Freeman. I will meet with Susan to review this with her.

*Id.* On October 10, Causton met with Moennich.

The next day, Moennich asked Navratil why Causton was overseeing FOCUS One. Moennich questioned the decision.[1] Per Moennich's request, Navratil asked Andrea Prokos, Chief of Staff to Fawell, why Causton was selected to oversee FOCUS One. Prokos responded that Causton was designated to oversee FOCUS One temporarily based on his breadth of knowledge and experience. Navratil explained this to Moennich.

On or about October 22, 2001, Moennich requested leave under the Family Medical Leave Act, 29 U.S.C. § 2611 *et seq.* ("FMLA"). She requested that the leave extend until January 2002. It is undisputed that MPEA granted her request through November 30, 2001, the last date of her employment.

It is undisputed that on October 23, 2001, Causton and Navratil met with Moennich. Moennich avers that the meeting was about her resignation. Navratil averred that they had the meeting to clarify Moennich's responsibilities during her temporary return to MPEA, and that they reiterated to Moennich that her assignment was to work on the E-Commerce project.

On October 29 and 30, 2001, Moennich sent memos to Navratil, disputing that her return to work was temporary. On October 30, 2001, Navratil responded to Moennich that "the fact that MPEA agreed, as a courtesy to you, to delay your separation date to

---

[1] Moennich contends that she expressed concern that "the selection was a white mans [sic] club selection."

4

November 30, 2001 was not intended to and did not constitute an acceptance of any purported rescission of your resignation." Def.'s Ex. 25. The letter further stated that Moennich's "last date of employment with MPEA remains November 30, 2001." *Id.*

On November 9, 2001, Moennich wrote a letter to Navratil stating that her employment with Freeman had been withdrawn. Moennich's last date of employment with MPEA was November 30, 2001.

## II. ANALYSIS

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In the consideration of a motion for summary judgment, the court must view the record and any inferences to be drawn from it in the light most favorable to the opposing party. *See Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir. 1991). Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmovant may not rest on the pleadings but must respond, with affidavits or otherwise, "set[ting] forth specific facts showing that there is a genuine issue for trial." *See, e.g., Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting Fed. R. Civ. P. 56). The "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A mere scintilla of evidence in support of the nonmovant's position is insufficient; a party will be successful in opposing summary judgment only when it presents definite,

competent evidence to rebut the motion." *Albiero*, 246 F.3d at 932 (citations and internal quotation marks omitted).

At the summary judgment stage, Moennich's burden is to come forward with evidence that gives rise to an inference that the employment action in question was taken for a forbidden discriminatory reason. *See Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1169 (7th Cir. 1998). However, Moennich has submitted little if any evidence in support of her claims. Further, Moennich fails to respond to most of MPEA's arguments, relying instead on conclusory allegations and her own affidavit. Nevertheless, the court has done its best to analyze Moennich's claims, as it has a duty to ensure that the moving party is indeed entitled to summary judgment.

Moennich's claims boil down to the allegation that she was discriminated against because of her sex. To make a prima facie case of disparate treatment, Moennich must demonstrate that 1) she was a member of a protected class; 2) she was meeting her employer's legitimate business expectations; 3) she suffered an adverse employment action; and 4) her employer treated similarly situated employees outside of the class more favorably. *Boumehdi v. Plastag Holdings, LLC*, No. 06 C 4061, -- F.3d --, 2007 WL 1583980, at *6 (7th Cir. June 4, 2007) (citing *Ballance v. City of Springfield,* 424 F.3d 614, 617 (7th Cir. 2005)). Moennich asserts that she suffered the following three adverse actions: (1) she was passed over for Director of FOCUS One for a "less qualified male"; (2) she was terminated when she questioned the decision; and (3) she was paid less than her subordinates throughout her employment. Pl.'s Opp. 4-5. Moennich makes no effort to separate these claims or explain how she meets the elements for each. However, for

the sake of completeness, the court will attempt to analyze whether Moennich can meet her burden on any one of them.

### A. Failure to Promote

Moennich's first argument appears to be that she was not promoted to the position of Director of FOCUS One. Because Moennich does not attempt to present direct evidence of sex discrimination, she must meet the initial burden of establishing a *prima facie* case by showing that: "1) she is a member of a protected group; 2) she was qualified for the position sought; 3) she was rejected for the position; and 4) the employee promoted was not a member of the protected group and was not better qualified than the plaintiff." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006) (quoting *Johnson v. Nordstrom, Inc.,* 260 F.3d 727, 732 (7th Cir. 2001)). If she overcomes that hurdle, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action, "which if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507 (1993) (citing *Tex. Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254-55 (1981)). At that point, "the plaintiff resumes her original burden of proof and must establish by a preponderance of the evidence that the defendant's proffered reasons are pretextual." *Sublett*, 463 F.3d at 737 (internal quotation marks omitted).

MPEA has consistently asserted that Causton was chosen to act as interim Director during Walder's transition because he was more qualified. MPEA points to Causton's substantial experience in the convention and hospitality related industries, including his having held various Director positions. Because MPEA has articulated a

7

legitimate, nondiscriminatory reason for filling the position with Causton, Moennich must establish that the proffered reason is pretextual.[2] *See St. Mary's Honor Center,* 509 U.S. at 507 (once a defendant comes forward with a nondiscriminatory reason for its actions, the burden shifting framework "simply drops out of the picture").

"Where an employer's proffered non-discriminatory reason for its employment decision is that it selected the most qualified candidate, evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180-81 (7th Cir. 2002) (internal quotation marks omitted). In other words, Moennich is required "to show that her qualifications are 'clearly superior,' or that she is 'significantly better qualified' for the job, or that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" *Mlynczak v. Bodman*, 442 F.3d 1050, 1060 (7th Cir. 2006) (quoting *Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006)).

Moennich's evidence falls woefully short on this element as she does not offer evidence demonstrating that her credentials are so superior to those of Causton that no reasonable person could have chosen Causton for the position unless motivated by

---

[2] Moennich makes no effort to demonstrate that she applied for the position. *See Grayson v. City of Chicago,* 317 F.3d 745, 748 (7th Cir. 2003) (holding that in a failure to promote claim the plaintiff must show that she applied for and was rejected for the promotion to establish an adverse employment action). However, because there is no evidence as to when MPEA actually made its decision regarding the Director position, and because it is not clear that MPEA posted the vacancy, the court will presume without deciding that Moennich could meet her burden of demonstrating that she was "rejected" for the position.

discriminatory animus. Rather, Moennich asserts only her unsupported conclusion that "a less qualified male got the job," presumably referring to Causton.[3] *See* Pl.'s Opp. 4.

### B. Retaliation

Moennich's next claim is that she was terminated in retaliation for complaining about MPEA's decision to make Causton the interim Director of FOCUS One. A prima facie case of retaliatory discharge under Title VII using the direct method requires a plaintiff to show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected expression and the adverse action. *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005); *Logan v. Kautex Textron N. Am.*, 259 F.3d 635, 638-40 (7th Cir. 2001). Once the plaintiff has succeeded in making a prima facie case, the burden of production shifts to the defendant to prove by a preponderance of the evidence that the same action would have occurred in the absence of the protected conduct. *Culver*, 416 F.3d at 546. "The persuasiveness of the defendant's explanation is normally 'for the finder of fact to assess, unless the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point.'" *Id.* (quoting *Venters v. City of Delphi,* 123 F.3d 956, 973 (7th Cir. 1997)).

MPEA first argues that Moennich was not terminated from her position and therefore did not suffer "an adverse employment action." Instead, according to MPEA, Moennich "voluntarily and apparently eagerly resigned in order to accept employment

---

[3] Moennich also contends that an African-American male named Victor Watts was allowed to rescind his resignation and return to work. To the extent that Moennich is attempting to argue that MPEA's decision not to allow Moennich to rescind her resignation was a discriminatory action, Moennich does not provide evidence to demonstrate that MPEA's reason for allowing Watts to return—that he took leave to go on military duty—was a pretext for discrimination. Furthermore, Moennich offers no evidence to demonstrate that she is similarly situated to Watts.

with Freeman and [MPEA] accepted her resignation." Def.'s Reply 10. Though Moennich attempted to rescind her resignation, MPEA chose not to accept her rescission. *Id.*

The problem with MPEA's argument is that there is a factual dispute over whether Moennich was allowed to return permanently. If, as Moennich contends, she was allowed to return permanently, then the subsequent ending of her employment would constitute termination. MPEA next argues that even if a jury could find that Moennich was terminated, she fails to show evidence of a "causal link" between her protected activity (her complaint to Navratil) and the adverse action. Specifically, MPEA argues that the decision to "terminate" Moennich occurred prior to her complaint, which would demonstrate that she could not have been terminated for complaining. However, MPEA's evidence in support of this is questionable. MPEA points to an email between Causton and an employee named Yolanda Green that predates Moennich's complaint indicating that Green and Causton believed Moennich was only returning on a temporary basis. *See* Def. Ex. 22 (October 9, 2001 Email from Causton to Green stating "[Moennich] will be here for two months and then go to work for Freeman."). However, MPEA does not demonstrate that what Causton and Green may have believed is evidence of what MPEA "decided".[4]

Viewing Moennich's evidence in the light most favorable to her, as the summary judgment standard requires, Moennich has satisfactorily demonstrated a causal link between her protected expression—her complaint regarding Causton's promotion based

---

[4] Part of the confusion with the facts at hand is that there is no evidence as to who at MPEA bears the final decision-making authority regarding hiring or firing. In the absence of conclusive proof that the decision-maker, whomever that may be, acted without an improper animus, the court cannot grant summary judgment to MPEA.

on his gender—and an adverse employment action—her termination. Moennich's version of the facts is that she was told by Walder that she was being allowed to return permanently, and that shortly after she complained about Causton's promotion to Navratil, she was terminated. Given that Moennich submitted a letter to Navratil on October 3, 2001, stating that she was rescinding her resignation, and given that Navratil did not respond until October 22 or 23, less than two weeks after Moennich complained to her, a jury could find that Moennich was terminated and that this termination was related to her complaint. "When an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct, the causation element of the *prima facie* case is typically satisfied." *Culver*, 416 F.3d at 546 (quoting *Lalvani v. Cook County, Ill.,* 269 F.3d 785, 790 (7th Cir. 2001) (internal quotation marks omitted).

MPEA's argument that Moennich's alleged termination was not in retaliation for her complaint but rather because she was only returning to MPEA on a temporary basis is similarly defective. Moennich avers that she returned to MPEA on a permanent basis, and that it was not until she complained that she was informed she was working at MPEA on a temporary basis. *See Stone v. City of Indianapolis Pub. Utils. Div.,* 281 F.3d 640, 644 (7th Cir. 2002) (Summary judgment should be granted only if the defendant "presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had no retaliatory motive."). Therefore, Moennich's Title VII retaliation claim survives summary judgment.

### C. Equal Pay Act

Moennich's third claim is that she was paid less than the male employees whom she claims reported to her. To prove a violation of the Equal Pay Act, Moennich must first establish a prima facie case of unequal pay by showing that 1) higher wages were paid to a male employee; 2) she and the male employee performed equal work requiring equal skill, effort, and responsibility; and 3) they had similar working conditions. *Cullen v. Ind. Univ. Bd. of Trs.,* 338 F.3d 693, 698 (7th Cir. 2003). Moennich has failed to meet this burden, conceding that there are no similarly situated employees at MPEA.[5] Pl.'s Opp. 5. As Moennich is unable to demonstrate that any male employee who performed the same work as she did was paid more than she was, her Equal Pay Act claim must fail.

### D. FMLA Claim

Moennich alleges in her complaint that MPEA violated the Family Medical Leave Act, 29 U.S.C. § 2601 ("FMLA") by terminating her while she was on medical leave, and argues in her brief that her "leave was granted until January and MEPA [sic] fired her in November." Pl.'s Opp. 8. However, Moennich does not dispute that she was granted leave only through November 30, 2001. Moennich herself testified at her deposition that she was granted FMLA leave only through November 30, 2001. Def.'s Ex. 1, 222. Therefore, her contention that she was granted FMLA leave until January 2002 is contradicted by her own testimony. Moennich has waived this claim by failing to present any evidence (or argument) that MPEA violated the FMLA. Therefore, the court grants MPEA summary judgment on this claim as well.

---

[5] In support of her claim, Moennich has submitted, without explanation, a chart detailing the salaries of various superintendents, foremen, the Senior Director of FOCUS One, the Senior Utilities Manager of FOCUS One and the Senior Electrical Manager. Moennich has not refuted MPEA's assertion that the salaries of those employees are based on the quality of their jobs as well as seniority and merit.

### III. CONCLUSION

For the foregoing reasons, MPEA's motion for summary judgment is granted in part and denied in part.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: August 6, 2007